Our next case for argument is 24-1965 Regeneron Pharmaceuticals v. Mylan Pharmaceuticals. Mr. Adams, please proceed. Thank you, Your Honor, and may it please the Court, William Adams for Samsung. Regeneron is trying to stifle fair competition by relying on a patent with only trivial differences from its expired formulation patents and whose claimed improvement over the prior art have absolutely no bearing on consumer demand or regulatory approval. Regeneron convinced the District Court to keep SB 15 off the market, pending trial, but that ruling rests on several legal errors that warrant reversal. I understand that PharmaCon's counsel in the next appeal is going to start with personal jurisdiction. I'd like to start with reparable harm. The District Court erred by entering a preliminary injunction without Regeneron showing that it will be irreparably harmed by the infringement of the asserted claims of the 865 patent. Contrary to the District Court's ruling and the premise of Regeneron's causal nexus argument, the asserted claims here are not coextensive with a drug product. It doesn't cover the drug product itself. It doesn't even cover— Can I just make sure I understand? I think I'm remembering the following, that the District Court treated the causal nexus question as a separate inquiry from other aspects of irreparable harm and that you appealed on the causal nexus but not the other aspects of irreparable harm. Is that wrong? That's correct, Your Honor. We are not— It confused me when you started talking about irreparable harm. No, but causal nexus is part of the irreparable harm. Understood. Understood, Your Honor. And we are not challenging the harm aspect. We're challenging whether that harm was caused by the infringement. And here, the patent claim, the asserted patent claims, cover very specific features of the product, including a very specific form of stability, 98 percent stability at two months under certain storage conditions. And stability measured in a very particular way. Yes, Your Honor. Because you used the term stability to cover a pretty wide range of possible measurement devices and maybe even physical phenomena. It's very specific. It's under very specific storage conditions. And we think that the District Court's ruling and the causal nexus analysis that's really turns on treating the patent and the drug as coextensive. But the formulation that's covered by the 594 patent, that's part of the public domain. It's been part of the public domain since 2021. And that includes the generic stability at four months. And so we don't think that that formulation, those expired aspects of the patent claim are available as a matter of law to support the causal nexus requirement. The required infringement under this Court's precedent is the patented features. The patented features are what must cause the harm. And here, the patented features, according to Regeneron itself, this is what got it out of the patent office, is the very specific 98 percent stability limitation. They also now assert differences over the prior art, the vial or glycosylation. But at no point did they show that any of those patented features drove demand or were required for regulatory approval. Simply here, they are claiming that the harm is effectively caused by competition, by SB 15 getting onto the market, not by any supposed patent infringement. And on that basis alone, we think this Court should reverse the preliminary injunction. We know it's undisputed on this record that the 98 percent stability feature has no bearing on consumer demand or on regulatory approval. And can I just ask, when you say consumer, who do you mean? The person with the eyeball or the doctor or the insurance companies? We think it's either the doctor or the consumer. The information that's available to them is indistinguishable on this record. I'm sorry, why would the consumer care at all? The consumer doesn't care how long the thing... That's exactly correct, Your Honor, because the patient... Yeah, but the doctor sure does. But the doctor doesn't know. The 98 percent stability limitation is not publicly facing information. It's not on a label. It's not information that the doctor's going to know. It's going to vary, perhaps, by lot. Some lots will have 98 percent stability at two months. Some lots may not. And the doctor who is receiving and prescribing that medication is not going to know because the FDA itself treats 98 percent stability, 97 percent stability, 96 percent stability at two months as equivalent, interchangeable. The FDA is absolutely indifferent as to that stability limitation, and it's not going to be information that the consumers would know. You can look at Appendix 15554 to 55. That shows that it's not publicly facing information. And, in fact, we know that FDA thinks this is so unimportant, this stability limitation, and you can look at Appendix 2753 for this, that it can be released. SB 15 can be released at 98 percent stability, 98 percent purity, and then gradate down to 96 percent over time. If the 98 percent stability limitation was important to the FDA, it certainly wouldn't be the starting point at time zero. And you also don't have to take this from me or even from the FDA, but Regeneron's own expert admits that the 95 percent stability is all that's necessary. That's in Appendix 2087 to 88. All that's necessary for what? Generally for regulatory approval. So here Samsung sought and obtained approval to 96 percent, and in its BLA, as a general matter, the FDA sometimes will allow it to go down to 95 percent. There's no magic number to 98 percent. That's just what Regeneron claimed here to get it out of the patent office over the double patenting challenge. And, again, at Red Brief 8, we know that that was the distinguishing limitation that allowed the claim and respectfully suggests that because there's no showing of nexus or a regulatory approval condition on infringing the 98 percent stability limitation, the easiest path here is to reverse based on causal nexus. But there's additional ground that we submit that warrants reversal, and that's on double patenting. The district court made two legal errors in its double patenting determination. First, it refused to treat the 594 patent as a reference patent, and second, it refused to look at the reference patent for anything beyond claim construction. On the first of those legal errors, the double patenting exists to prevent a patentee from obtaining a later filed, issued, and expiring patent on obvious variants of an earlier filed, issued, expiring patent. Once an invention has been committed to the public, a patentee simply can't try to claw that back. So let me just ask you, so in thinking about this, it began to feel to me as though committed to the public or dedicated to the public is more a conclusion than it is a simple kind of descriptive fact. And it might matter here when there was a terminal disclaimer that was accepted by the applicant. How does one, how one characterizes that seems, feels like the question about this sort of threshold question, whether the 594 counts at all as a reference? Sure. I refer, Your Honor, to this court's decision in Yamazaki, which discusses terminal disclaimers and the, I guess, the legal effect thereof. And it says when a patent issues with a terminal disclaimer, the disclaimer becomes part of the original term. It defines it, and it's treated as if the additional term never existed. But not for purposes, these purposes, right? No, it's interpreting the statute. It's a little paragraph. Exactly, Your Honor, no. But I think it's important to, that's shown with the legal impact. So to get out of the patent office, Regeneron had to give up term. It had to give up six years of term, and that has legal meaning. And in giving up that six years of term, they committed the invention in the 594, any obvious variance thereof, to the public. And essentially, Regeneron is trying to claw that back by saying, don't even look at the initial 594 patent. That doesn't even exist for purposes of double patenting analysis, simply because it terminated in 2021 due to a terminal disclaimer. But they had to give that up. They had to give up those six years to get out of the patent office. That has to have legal meaning. And the district court, frankly, created a terminal disclaimer exception to the reference patent analysis that this court regularly conducts. So we think that was the first legal error. Yeah, but counsel, even if the court made an error in not treating this as a reference patent, it went on and alternatively found that even if it did, I think if I remember right, the court found four differences between Claim 5 and the claims at issue here, and went through a lot of evidence about why each of those differences, and don't you have to overcome all four of those? Sure, Your Honor. It feels like this district court did, you know, threw the kitchen sink at you. I mean, everything. They're like, okay, this is not a reference. Even if it is a reference, you don't win. And let me give you four different reasons you don't win. So don't you have to overcome all of that to prevail? Yes, Your Honor, except that all of those factual findings that Your Honor just referenced are predicated on the second legal error that I mentioned, the failure to look at the 594 reference patent specification for anything other than claim construction. If you look at the specification, and we know under this Court's decisions like Basel and Vogel, that it's okay to look at the specification beyond just claim construction. You can look at it to interpret the coverage of a claim, and you can look at it to determine if there's an obvious variant from what was previously claimed and disclosed. And here, the district court failed to look at the specification for specifically examples 3 and 4, which are specific embodiments. Can I understand, do you think obviousness-type double patenting covers, you can't patent in the second patent anything at all that was disclosed in the spec of the first patent? No, Your Honor. So you do agree that you're tethered to a comparison of the claims, and your argument, I think, if I understand it, is just that you can look to the specification to understand the scope of those claims? Is that what your argument is? That's part of it. You can look to the specification to understand the scope of the claims, and for disclosed utility, for example, as well, that's under the Sun Pharmaceuticals case. What you can't do is you can't, Kaplan is a good example. In Kaplan, this court said that it was improper, there were two inventions disclosed in the specification. One was with respect to the claim that was at issue, and another was from a joint inventor, so it was a different patenting entity. And this court said you can't look at the part of the spec that discloses that other invention. That's using the specification as prior art, and that's improper as a matter of law. But you can look to the disclosures with respect to the claim that is at issue. That's not impermissible. But I feel like what you're trying to do is read limitations from the spec into Claim 5 of the other patent. Like, for example, the 98%, right? That's not in that claim. But it's not... It is, but it's not in the claim. So what you're trying to do is take embodiments of the spec, read them into the claim, and once they're read in as limitations that aren't present in those claims, then say, look, there's obviousness type double patenting. Your Honor, I'm not going to disagree with your description of what we're trying to do, but I think it's appropriate and impermissible under this court's decision, like Basel and Abbey. They are not... Those decisions both... The reference claim there involved... were genus types claims. The specification disclosed the species that was particularly at issue in the asserted claim, and this court held that that was subject to... It was appropriate to look at and was subject to obvious type double patenting. This court affirmed the board in Basel on just that ground. So I agree with your description, but I think it's okay under this court's case law, and if there are any further questions, now I'd like to reserve the balance of my time. Can I just ask one point for the factual question? Are there any generic prefilled syringes? Any generic prefilled syringes? I don't know the answer to that, Your Honor, but I'll find out for you. Thank you. Good morning. May it please the court. David Burrell on behalf of Regeneron. I'd like to start where my opponent ended, if it's all right with the court, which is with double patenting. I think the law is exactly as Chief Judge Moore articulated it. It is impermissible and always has been for a court to use the patent specification to read in limitations into a later claim or to find motivation or reasonable expectation of the success for a later claim. I would submit that Samsung gives the game away on page 17 of its reply brief, where they ask about the motivation issue we raised, and they say, the motivation is solved, just look at example three. That's our own specification, and our own specification under Otsuka can't be used against us. They cite two cases to try to disturb that proposition. First, they cite Vogel, then they cite Basel, and they also actually cite AbbVie, so there are three. Those cases all reflect that there are two recognized exceptions for which a court may look to a specification in the obviousness-type double patent inquiry. First, to understand the scope of the claims. That's what was going on in Vogel. The court said, it's hard to understand what this claim means. We need to look at a tangible example in order to understand it better, and it did that. And by the way, it then used prior art, not the specification, to assess obviousness, the Elly's reference in that case. So for example, they want to read in, or impute in vial, 98%, all those things. Your argument would be that that is not to help understand or interpret the scope of the claim. For example, the claim that they're using for obviousness-type double patenting has absolutely no stability limitation. It's different than that. It simply says stable. There's nothing about 98%, not a particular kind of stability, stable by size exclusion chromatography after two months. I agree completely with Your Honor's observation. One can't do that. And I think the clearest case to show that is the Kaplan case. What they are doing here is suggesting that any time you have both a reference claim and an asserted claim that fall within the same example in the specification, you have double patenting. Judge Rich reversed the board for applying that and implying the language from Vogel. Excuse me? Oh, excuse me. Writing for the court, Judge Rich said, the board got it wrong here. And the court observed in Kaplan that they had confused domination at the board with double patenting. And domination is irrelevant to double patenting. He called this proposition that one can get two different claims from the same subject matter, the domination sort of inquiry, as common. Was he the only judge? Was that a one-judge panel? No, it was a three-judge panel, Your Honor. But what the court said there was that this principle is one of the simplest, clearest, soundest, and most essential principles of patent law. And I would submit that Samsung is asking the court to introduce it today. What happened in Basel is totally consistent with that. In Basel, the reference claim called for olefins. And the court looked to the specification to understand what olefins meant. In other words, are ethylene and propylene within the scope of olefins? That's claim construction. The obviousness inquiry was separate, and it simply deferred to the board on the obviousness inquiry. Claim construction is not what Samsung is doing here. They proudly announced at page 42 of their brief that they're not disputing the claim constructions authored by the court below. They disputed it below. They don't press that argument here on appeal. The second exception comes from the old line of cases like In Re Bic and was applied most recently in the AbbVie case that they cite. That exception relates to using the specification of the reference claim to determine the utility of the reference claim. Those are cases where the reference claim calls for a compound or a molecule, and the later claim calls for a use of that molecule. And the old In Re Bic case said, well, you can't get a claim for the molecule without a utility, so it's fair to look back to the specification in order to understand the utility for the molecule in assessing double patenting. The Eli Lilly case makes that very clear how narrow that exception is, and it was applied recently by this court in AbbVie. That's not what Samsung is doing here. They're not within that exception. 98% stability by SEC is not the utility of the formulation. The utility of the formulation is ophthalmic use. This case would be like Eli Lilly and Sun and Bic if we claimed the formulation in the first patent and simply claimed the ophthalmic use in the second. That's not what's going on. They're reading limitations from the specification that are not in our claim in order to have double patenting, and there has not been a single case that has invalidated a claim for double patenting on that basis in the more than 200 years that courts have been deciding double patenting cases, starting in 1819 with just a story in the Odeurone case. Did he do that one on his own? No, he did not. Okay. You would think you would learn this lesson by now. I apologize. I apologize, Your Honor. That case and all of its progeny, there's never been a case invalidating a claim on the basis that Samsung is pressing here. With that, I will turn to the second argument they raised. Can I just ask, while we're still on the let's assume the 594 is in fact available, and here's why, nevertheless, it's not obvious, and the district court found several elements of the new claim that has non-obvious variants of the 594. One of them is the vial. Yes, Your Honor. You don't need this if the rest are sound, but how is that sound? We don't need that, but the factual finding by the district court was that the person of ordinary skill, starting with the pre-filled syringe of Claim 5 of the 594, would not have wanted to use a vial. It would have been less convenient. It would have been considered a step backwards for patients and ultimately for the users in the doctor's offices. So what? Well, I mean, per some of this court's... Right. We don't have... In fact, we have quite a number of cases that say doing something that is, at least in some respect, less desirable can still be obvious. Right. Those cases, I agree, stand for the proposition that it doesn't have to be the best option in order for something to be obvious, but it does have to be desirable. The Orexo case, the Winner v. Wang case, all stand for the proposition that what is obvious is what's desirable, not what is possible. And the question we would agree is it may be possible to use a vial, but the obviousness question, for motivation purposes... Do you know the answer to the question I asked your friend about? Are there prefilled syringes of a generic sort out there? As of today, the answer is yes. There is one prefilled syringe. That happened after this preliminary injunction was decided. And wasn't there some very large percentage of... Somewhere I read, I think it was in the district court's opinion, about doctors or whoever the actual purchasers are preferring the prefilled syringes over the vial? Indeed, that is the preferred for most applications and for most physicians. Does that affect... I mean, it probably doesn't affect our decision. Does that affect the consequences of this dispute we're deciding today? No, I don't think so, Your Honor. I think the irreparable harm inquiry, for example, was conducted vis-à-vis the vial sales, in particular in the Fort Foundry irreparable harm. And as Your Honor noted, I don't think they're trying to disturb any of the irreparable harm findings. The only thing that they are trying to challenge is the court's ruling on nexus. So if I may turn there, I would submit that Samsung is changing the standard for the nexus inquiry. The standard articulated by the court, whichever judges wrote the opinion, is that one looks to the product as a whole. This inquiry of taking one limitation out and asking the question, is the limitation that got the claim out of the patent office driving demand? Not a single court has used that kind of inquiry. The only case they cite is Apple II. No court, district court or otherwise that they've cited, has tried to apply Apple II to say that that's what it stands for, and it doesn't. Apple II, as clarified later by Apple III, simply stands for the proposition that one must be harmed by infringement, and you look at the claim as a whole. And the court made factual findings here, A-164, that the product here, both ILEA and the proposed generic product SB-15, is embodied by the claim as a whole. There is no feature of the accused product that is not embodied in the claims. This is not like some smartphone where I have a patent to the audio chip and someone I understand that everything that they submitted to the FDA tested at 98% stability. So I get the facts, but the question, I think, maybe one of their arguments is, but we can make this at only 96% stability. So since there is a non-infringing way for us to produce this product, we should not be enjoined from producing that non-infringing alternative. I think I just said something I shouldn't have. It's okay. Are you sure? Yes. Because I can have it. I said it too. Oh, okay. All right. My clerk just read and bowled and yelled at me. I won't repeat what Your Honor said, but I will observe that Samsung has not appealed the scope of the injunction here. The injunction was entered, and it was appropriately entered, under this court's case law, like Forrest Labs, against the accused product, which, of course, here is their proposed BLE product that would infringe our patent. That product is the product that was what they submitted to the FDA, which all showed that it fell within the patented range of 98%. Yes. And so you're saying, if I understand it, that the correct course of action, given this set of facts, is to ask the district court for some amendment or change to the injunction if they have a different product that can be produced at a non-infringing stability. I would submit they already had an opportunity to do that. The form of the injunction is- They can do it at any time, right? They could go forward afterwards, I think under Rule 65, and say that the circumstances have changed, and we want to amend the injunction. And there's a standard for that, and they can try to do that below. But with respect to the injunction that was entered by the court that's at issue here today- With regard to the only product that the court had in front of it at the time- Yes. Did they make this argument about, we can produce a non-infringing alternative to the court below? They did. They, in fact, made it as a non-infringement argument as well. It was rejected. They don't press that. And then they also made it as an irreparable harm nexus argument. And what, if anything, did the court say about that in the context of irreparable harm? The court observed that they are harmed, that we, Regeneron, will be harmed by the sale of their product. There's only one product. It's not as if they say, we have a product that is less than 98 percent, we have a product that's more than 98 percent, so one should be enjoined, one shouldn't be enjoined. One looks at the claim as a whole and asks- Just to be clear, so this court found, basically, a likelihood of infringement of this product-  Because of the samples that the FDA had, all of which were within the claimed range, and so they have enjoined this product. Exactly right. This product of the ABLA. And so they may have other products they could make that would not fall within the claims, but that's not actually the subject of this injunction. Correct. The subject of this injunction is the product for which they filed the ABLA, and under 271B- Got it. Anything further? No. Thank you very much, Your Honor. On causal nexus, under their theory- Thank you, Your Honor, for the additional time. Under their theory, you can get an injunction based upon expired elements of a patent claim. They're getting injunctive relief that is beyond what they can get from the patent office themselves. The driver of demand has to be on the non-expired patented features of the 865 patent. That is the very specific 98% stability limitation. And even if we have approval, and we do have approval to go down below 98%- Yeah, but you submitted a product to the FDA, and the only evidence in the record that the court was looking at at the time was that all of the samples that you submitted met the 98% limitation. You have a product that has a name, right? And the fact that you could manufacture it, so go back and ask the district court for an amendment to the injunction, and say, you know what? We're going to issue this other product, and it's going to be at this, and we want to be clear that it's not covered by the injunction. True, Your Honor, but the injunction itself is overbroad as a matter of law under this court's causal nexus precedence because the 98% stability limitation has no bearing on demand or regulatory approval. We submitted laws that were- They found you were likely to infringe the whole claim, right? So whether you think it's the 98% or the combination, which is what they say, they found you were likely to infringe the whole claim, all of the elements of the claim, and all of them taken together. And so you are likely to infringe all of it. And, Your Honor, but the only novel features of the claim that I've heard today and in the briefing are the vial, the glycosylation, and the 98% stability limitation. Everything else is in the public domain. And so you cannot hide behind those features, respectfully, to warrant an injunction. On double patenting, I would respectfully, again, refer the court to Basil. I think we're well within the facts there. And Kaplan is what is the impermissible use. You can't rely on a portion of the spec about an invention that's not claimed. We're not doing that. We're just looking to find the disclosed embodiments. The District Court found in Appendix 97 that Examples 3 and 4 are the disclosed embodiments of the 594 patent. Under Basil, we are permitted to look at that, and the District Court should have looked at that to understand the coverage of the claims. I respectfully ask you to reverse.